```
                  UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
                      EVANSVILLE DIVISION


UNITED STATES OF AMERICA,    )
                             )
          Plaintiff,         )
                             )  Cause No. 3:08-CR-00013-9
       vs.                   )
                             )  Evansville, Indiana
TREVOR PERRY,                )
                             )  August 13, 2008
          Defendant.         )
```

TRANSCRIPT OF SENTENCING ON JURY'S VERDICT


BEFORE THE HONORABLE RICHARD L. YOUNG

CHIEF UNITED STATES DISTRICT COURT JUDGE


```
Court Reporter:        Judy Farris Mason, CSR
                       Official Court Reporter
                       United States District Court
                       318 Federal Building
                       Evansville, Indiana  47708
                       Tel.  (812)459-9805
                       Email: Judy_Mason@insd.uscourts.gov
```


Proceedings reported by stenotype.
Transcript produced by computer-aided transcription.

A P P E A R A N C E S :


FOR THE GOVERNMENT:

                          Bradley A. Blackington, Esquire
                          United States Attorney's Office
                          Southern District of Indiana
                          10 West Market Street
                          Suite 2100
                          Indianapolis, Indiana  46204-3048
                          Telephone:  (317)229-2400

FOR THE DEFENDANT:

                          John W. Tullis, Esquire
                          312 First Street
                          Owensboro, Kentucky 42302
                          Telephone:  (270)826-1740

3

```
 1                    (Open court at 8:20 a.m.)

 2             THE COURT:  Good morning.

 3             MR. TULLIS:  Good morning, Your Honor.

 4             MR. BLACKINGTON:  Good morning.

 5             THE COURT:  United States of America versus Trevor

 6   Perry, Cause Number 3:08-cr-13-9.  Mr. Perry is here in person,

 7   in custody, with his attorney, John Tullis; the United States

 8   by Assistant United States Attorney Brad Blackington.

 9      My record reflects that this matter was tried to a jury in

10   August, and on August 20, 2008, the jury returned a verdict as

11   to the defendant Trevor Perry as guilty on Count 1, not guilty

12   on Count 8, which was renumbered as Count 6 for trial purposes,

13   and we are here today for sentencing.

14      And is that your understanding of the record, Mr. Tullis?

15             MR. TULLIS:  Yes, Your Honor.

16             THE COURT:  Mr. Blackington?

17             MR. BLACKINGTON:  Yes, Your Honor.

18             THE COURT:  All right.  Mr. Tullis, would you and your

19   client please take the lectern.

20             MR. TULLIS:  Yes, Your Honor.

21              (Counsel and defendant approach the podium)

22             THE COURT:  Mr. Perry, we're going to go through your

23   presentence investigation report.  If at any time during this

24   proceeding you do not understand what we're discussing or you

25   have a question about anything, will you make sure to make your
```

```
 1   attorney aware of your question so we can make our best attempt

 2   to answer it for you?

 3           THE DEFENDANT:  Yes, sir, I will.

 4           THE COURT:  Mr. Perry, have you had an opportunity to

 5   review the presentence investigation report?

 6           THE DEFENDANT:  Yes, sir, I have.

 7           THE COURT:  Mr. Tullis, have you had an opportunity?

 8           MR. TULLIS:  Yes.

 9           THE COURT:  And Mr. Blackington?

10           MR. BLACKINGTON:  Yes.

11           THE COURT:  And based on upon your review of the

12   presentence investigation report, Mr. Perry, do you find its

13   contents to be true and accurate?

14           MR. TULLIS:  I believe there -- I know one discrepancy

15   is there's a reference that Mr. Perry was raised by his

16   grandmother.  I think that was a mistake.  He was raised,

17   obviously, by his mom.  What he told the probation officer,

18   Billie Gariess, was that his grandmother had played an

19   instrumental part in his life as a child, as a juvenile, as a

20   young man, as an infant.

21                 (Defendant and counsel conferring)

22           THE COURT:  But other than that -- and I'm not -- and

23   I know you're maintaining that you were not guilty of these

24   charges and you're maintaining your innocence, so I'm not

25   asking you whether the facts as recited in the presentence,
```

1   whether those are true and accurate, but everything else other

2   than the facts regarding the offense --

3           THE DEFENDANT:  Yes, sir.

4           THE COURT:  -- is that all true and accurate?

5           THE DEFENDANT:  Yes, sir.

6           THE COURT:  Okay.  All right.  How old are you today,

7   Mr. Perry?

8           THE DEFENDANT:  Thirty-one.

9           THE COURT:  Thirty-one.  Be 32 in January?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  History of the charge:  On August 28,

12  2007, the defendant was indicted, Cause Number 7-25 in this

13  district.  On May 21, 2008, an eight-count indictment was filed

14  in this district, Cause Number 08-cr-13, Count 1 alleging that

15  Thomas Perkins, David Neighbors, Keshaun Horne, Antonio Miles,

16  Lafrederick Taylor, Derrick Stanfield, Kamal Sims, Jason Kirk,

17  Trevor Perry, Dimetri Cabell, Jason Horne, and Maurice

18  Nicholson conspired to distribute 50 grams or more of cocaine

19  base and five kilograms or more of cocaine hydrochloride, a

20  violation of United States Code, beginning on or around

21  April 9, 2007, until August 30, 2007.  And then the defendant

22  was also named in Count 8, felon in possession of a firearm,

23  violation of United States Code.

24      On July 17, 2008, the United States filed an information

25  pursuant to 21 U.S. Code, Section 851, alleging the defendant

1    has a prior felony drug conviction.

2        As I indicated earlier, the defendant was found guilty of

3    Count 1, the conspiracy charge.  The jury found the conspiracy

4    but as to the defendant did not involve cocaine hydrochloride.

5    Additionally, the jury found the defendant previously had been

6    convicted of possession of marijuana and dealing in cocaine,

7    both felonies, and then the jury found the defendant not guilty

8    of felon in possession of a firearm.

9        There was a motion to dismiss the indictment in 07-25.  I

10   don't know if that's been ruled on yet or not, but I'm assuming

11   that that matter will be dismissed upon sentencing in this

12   matter.

13       The offense conduct is listed in paragraphs 15 through 42.

14   The Court obviously observed the trial and heard the testimony

15   and the other evidence at the trial, and the Court's opinion of

16   the evidence was that the jury verdict was supported and the

17   conviction was supported.  The evidence was strong of the

18   defendant's participation in the conspiracy.

19       The offense conduct as listed in the presentence

20   investigation report:  From May 22 through August 22, 2007, DEA

21   conducted wire surveillance over David Neighbors' telephones.

22   Wire surveillance coupled with statements from Neighbors'

23   accomplices revealed the existence of a cocaine-trafficking

24   organization that operated in Evansville from May through

25   August 2007.  David Neighbors directed the activities of the

1  organization, and Neighbors, also accompanied by other

2  individuals, traveled from Evansville to Louisville, Kentucky,

3  to obtain cocaine from Thomas Perkins.  Individuals who

4  traveled from Evansville to Louisville with Neighbors included

5  Antonio Miles, Keshaun Horne, and Lafrederick Taylor.

6  Neighbors then distributed the cocaine to his customers in

7  Evansville, who included Lafrederick Taylor, Derrick Stanfield,

8  Kamal Sims, Jason Kirk, and the defendant, Trevor Perry, and

9  others.

10     On May 30, 2007, David Neighbors traveled to Louisville and

11  obtained 383 grams of crack cocaine.  Prior to Neighbors

12  traveling to Louisville to acquire the cocaine from Perkins,

13  the defendant, Trevor Perry, advised Neighbors that he needed

14  to obtain some cocaine.  The two conversed about the high

15  quality of the cocaine during the conversation.  During a later

16  conversation on May 29, 2007, Perry advised Neighbors the

17  cocaine was of high purity and stated he needed to receive some

18  for distribution immediately.  Neighbors told him Kamal Sims

19  knew an individual Perkins who had some cocaine.

20     On May 31, 2008, Neighbors traveled to Louisville and

21  obtained 383 grams of crack cocaine from Perkins.  On June 5,

22  2007, Neighbors traveled to Louisville and obtained 510.3 grams

23  of crack cocaine from Perkins.  Prior to Neighbors leaving on

24  June 5, 2007, the defendant contacted him asking about the

25  availability of cocaine from Perkins.  After Neighbors returned

with the cocaine, Perry asked Neighbors to hold, "half of what
I usually get," referring to a quantity of cocaine.  Perry said
he would meet Neighbors in one-half hour.  Later on Perry asked
Neighbors for a "third," referring to a quantity of cocaine,
and Neighbors agreed to front him cocaine.

     On June 7, 2007, Neighbors traveled to Louisville and
obtained an unknown amount of powder and crack cocaine from
Perkins.  On June 9, 2007, Neighbors and Horne traveled to
Louisville and obtained 510.3 grams of crack cocaine from
Perkins.  The defendant contacted Neighbors as Neighbors was
driving to Louisville to obtain cocaine from Perkins.  The
defendant asked Neighbors if he had possession of the cocaine,
and Neighbors replied that he was "about to be."  After Perkins
returned with the cocaine, the defendant asked Neighbors if he
had the cocaine, and he responded affirmatively.  The defendant
asked Neighbors, "Can you grab me some, and I'll get it back to
you?" referring to cocaine.  Later Perry asked Neighbors for
the cocaine, and Neighbors replied that he was on his way.

     On June 14, 2007, Neighbors traveled to Louisville,
Kentucky, and obtained 109.9 grams of crack cocaine from
Perkins.  The defendant contacted Neighbors after Neighbors had
returned from Louisville with cocaine and asked Neighbors to
contact him regarding the delivery of cocaine.  Neighbors
replied that he only had a small amount of cocaine and needed
to travel to Louisville to get more cocaine.  Perry asked

1  Neighbors if he needed money to take to Louisville to purchase

2  the cocaine.

3      On or about June 24, 2007, Neighbors traveled to Miami,

4  Florida.  Prior to his departure, Neighbors left 226.8 grams of

5  crack cocaine with Miles.  This crack cocaine was obtained from

6  an unknown source.  Additionally, Neighbors provided Miles

7  instructions regarding the distribution of crack cocaine.

8      On June 26, 2007, the defendant asked Neighbors for

9  one-half ounce of crack cocaine, and Neighbors replied that he

10 would call Miles.  On July 4, 2007, Selmo Cadet spoke with

11 Neighbors and told him he would sell him an ounce of powder

12 cocaine for $900.  Neighbors agreed to purchase one ounce of

13 powder cocaine.  Cadet advised Neighbors to meet him at 1652

14 Evans in Evansville.  Neighbors told Sims to meet Cadet at this

15 location in order to obtain an ounce of cocaine.  Sims

16 clarified with Neighbors the amount and the cost.

17     On July 5, 2007, Sims spoke with Neighbors and told him

18 Cadet was distributing cocaine by the ounce.  Neighbors

19 inquired if Cadet had four ounces of cocaine, which Sims

20 confirmed.  Neighbors confirmed the price was $3,500.  Sims was

21 instructed by Neighbors to acquire four ounces of cocaine.

22     On July 8, 2007, Neighbors traveled to Louisville and

23 obtained 255.15 grams of powder cocaine and 382.7 grams of

24 crack cocaine from Perkins.  The defendant contacted Neighbors

25 before Neighbors had obtained cocaine from Perkins and asked if

1  they were going to be "on deck," referring to possession of

2  cocaine.  Neighbors responded affirmatively.

3      Perry asked, "No baby powder?"  Neighbors replied, "They

4  ain't got none," referring to powder cocaine.  Perry asked if

5  "it," referring to crack cocaine, was "good."  Neighbors

6  responded affirmatively.  Perry said, "Run it," directing

7  Neighbors to obtain the crack cocaine.

8      Later in the day Neighbors obtained money from Perry to

9  purchase crack cocaine.  After Neighbors obtained the crack

10  cocaine from Perkins, the defendant contacted Neighbors.  The

11  defendant asked Neighbors, "You gots it?" referring to the

12  crack cocaine.  Neighbors replied, "I've just got to get some

13  people out of the way, then I gotcha."

14      Later Perry told Neighbors that "he," referring to Perry's

15  cocaine customer, wanted "half of that," referring to a

16  quantity of cocaine.  Neighbors asked, "A quarter," referring

17  to one-quarter ounce of cocaine.  Defendant Perry responded

18  affirmatively.

19      On July 29, 2007, Neighbors traveled to Louisville and

20  obtained 255.15 grams of powder cocaine and 255.15 grams of

21  crack cocaine from Perkins.  On August 7, 2007, after

22  Neighbors, accompanied by Miles, traveled to Louisville and

23  acquired 256.5 grams of powder cocaine and 372.2 grams of crack

24  cocaine from Perkins, his vehicle was stopped by the Evansville

25  Police Department.  Prior to cocaine being seized, the police

1   released both Neighbors and Miles.  Neighbors then contacted

2   Sims and reported being stopped by the police and they were

3   currently searching the vehicle, which had cocaine hidden under

4   the seat.  Neighbors requested Sims to travel to a location to

5   pick them up.  While en route to their location, Sims spoke

6   with them via telephone and inquired as to whether they

7   believed the police had been following Neighbors.

8        On August 30, 2007, during a search of Perry's residence, a

9   .12-gauge Remington 870 shotgun was found in the hall closet.

10  The hall closet is a common area and the defendant had a

11  roommate; therefore, it cannot be determined the defendant

12  possessed a firearm, and the jurors apparently agreed with

13  that.

14       Surveillance observed Neighbors acquiring cocaine from

15  Perkins in Louisville ten times; Selmo Cadet, two times; and an

16  unknown source on one occasion.  These acquisitions totaled at

17  least 3,373.2 grams of crack cocaine and 908.6 grams of powder

18  cocaine.

19       Based on the conversations between Neighbors and the

20  defendant, it could be inferred the defendant was aware of the

21  larger organization and can be held responsible for the

22  reasonably foreseeable acts of others in the conspiracy in

23  furtherance of the commission of the offense.

24       Victim impact:  There's no identifiable victim other than

25  society at large.  No information suggesting the defendant

1  impeded or obstructed justice.  The defendant has maintained

2  his innocence, was found guilty by a jury.  No statement has

3  been submitted by him or on his behalf. Therefore, there's no

4  acceptance adjustment.

5      Offense-level computations:  The 2007 manual was used to

6  determine the advisory guideline.  As the offense involves

7  cocaine and cocaine base, they must be converted to a common

8  marijuana equivalency.  Pursuant to the guidelines drug tables,

9  3,373.2 grams of cocaine base are equivalent to

10 67,464 kilograms of marijuana, and 908.6 grams of cocaine is

11 equivalent to 181.72 kilograms of marijuana.  The total

12 marijuana equivalency is 67,645.72 kilograms.

13     Count 1, the conspiracy to distribute less than five grams

14 of cocaine base, Sentencing Commission guideline for a

15 violation of 21 U.S. Code 841(a)(1) and 846 is found at Section

16 2D1.1(c)(1), calls for a base offense level of 38, as the

17 offense involved the equivalent of 67,645.72 kilograms of

18 marijuana, minus two levels as directed by Application Note

19 10(D)(i) of the May 1, 2007, supplement, for a base offense

20 level of 36.  There are no other adjustments.

21     He does have some Chapter 4 enhancements.  As shown in the

22 criminal history, the defendant's been convicted of felony

23 offenses, dealing and possession of sawed-off shotguns in

24 Vanderburgh County, Indiana, in January of 1995; dealing in

25 cocaine in Vanderburgh County, Indiana, on October 21, 2002.

1  Since the instant offense involves a controlled substance and

2  the defendant was 18 years or older at the time of its

3  commission, the defendant is a career offender within the

4  meaning of 4B1.1 of the guidelines.   The offense level

5  determined under 4B1.1(b) is 34; however, the offense level

6  remains at 36 since it is greater than all the levels that

7  apply.   Total offense level, 36.

8      Criminal history:   I find no juvenile adjudications.   Adult

9  criminal convictions begin with an arrest at age 17 in December

10 of 1994, dealing and possession of sawed-off shotguns,

11 Vanderburgh County Circuit Court.   On January 25, 1995, he

12 received two years, suspended; two years probation.   In May of

13 '95 his probation was revoked.   He was placed on work release

14 for two years.   On May 30, 1995, his work release was revoked,

15 sent to the Indiana Department of Corrections for two years.

16 January 31, 1996, release from incarceration to parole.   In

17 April of 1997, he was released from parole.   Pursuant to

18 4A1.1(a) and 4A1.2(k)(1), three criminal history points are

19 assessed.

20     In April of 1995, charged with possession of marijuana as a

21 misdemeanor; in Count 2, false reporting, Vanderburgh Superior

22 Court.   Count 1, he was given a diversion, judgment withheld

23 and ultimately dismissed.   On February 13, 1997, Count 2,

24 received 30 days, suspended.   Zero criminal history points.

25     May of '95, false reporting, misdemeanor, Vanderburgh

1  Circuit Court.  May of '95, 180 days, suspended, zero criminal

2  history points.

3      August 12, 1997, arrested and charged with possession of

4  marijuana as a misdemeanor; Count 2, resisting law enforcement,

5  a misdemeanor, Vanderburgh Superior Court.  September of '97,

6  Count 1, 30 days, suspended; Count 2, fine and costs, which

7  were suspended.  Pursuant to 4A1.1(c), one criminal history

8  point is assessed.

9      September of 1997, charged with minor in possession for

10  consuming an alcoholic beverage, a misdemeanor, Vanderburgh

11  County.  October 13, 1997, received ten days, suspended, zero

12  criminal history points.

13      December 3, 1997, charged with public intoxication, a

14  misdemeanor.  In May of 1998, received ten days, suspended,

15  zero criminal history points.

16      June of 1998, trespass, a misdemeanor; Count 2, resisting

17  law enforcement, a misdemeanor, Vanderburgh County, Indiana.

18  October 15, 1998, Count 1, 90 days, suspended; Count 2, 24

19  hours community service in lieu of fine and costs.  On

20  September 23, 1999, he received 24 days in jail.  Pursuant to

21  4A1.2(c)(1), zero criminal history points are assessed.

22      In June of 1998, defendant was charged with possession of

23  marijuana as a felony, Vanderburgh Circuit Court.  On March 3,

24  1999, received a sentence of 18 months, Indiana Department of

25  Corrections, concurrent with his sentence imposed which is

referred to in paragraph 69.  June 13, 1999, he was released
from incarceration to parole and March of 2000 was released
from parole.  Pursuant to 4A1.1(a), three criminal history
points are assessed.

July of 1998, Count 1, battery, misdemeanor; Count 2,
possession of marijuana, a misdemeanor, Vanderburgh Circuit
Court.  March 3, 1999, received one year, Indiana Department of
Corrections; Count 2, 18 months, Indiana Department of
Corrections, concurrent to the sentence imposed in paragraph
68.

Mr. DeCarli, I'm assuming that's a felony, considering that
was 18 months on Count 2.

PROBATION OFFICER ROBERT DeCARLI:  Yes, sir, that's a
typo.

THE COURT:  Released from incarceration to parole in
June and then March 2000 released from parole.

April of 1999, obstructing traffic, a misdemeanor,
Vanderburgh Superior Court.  January 4, 2000, received a fine
and costs.  October 13, 2000, sentenced modified, 16 hours
community service in lieu of fine and costs.  Zero criminal
history points assessed.

September of 1999, resisting law enforcement, a
misdemeanor, Vanderburgh Superior Court.  July 20, 2000,
received 180 days, suspended, fine and costs.  October 13,
2000, sentence modified, 16 hours community service in lieu of

1  fine and costs.  Zero criminal history points assessed.

2      November of 1999, public intoxication, misdemeanor,

3  Vanderburgh County.  January 14, 2000, fine and costs.

4  October 13, 2000, sentence modified, 16 hours community service

5  in lieu of fine and costs.  Zero criminal history points.

6      March 13, 2001, Count 1, public intoxication, a

7  misdemeanor; Count 2, disorderly conduct, misdemeanor,

8  Vanderburgh Superior Court.  March 15, 2001, on Count 1 and 2,

9  received 90 days, suspended, 48 hours community service work,

10  fine and costs.  Zero criminal history points assessed.

11      November 4, 2001, possession of marijuana, a misdemeanor,

12  Vanderburgh County.  October 21, 2002, received 180 days,

13  suspended.  Pursuant to 4A1.1(c), one criminal history point is

14  assessed.

15      December 3, 2001, dealing in cocaine, a felony, Vanderburgh

16  County, Indiana, Circuit Court.  October 21, 2002, received

17  seven years, Indiana Department of Corrections.  November 5,

18  2005, released from incarceration to parole.  On November 5,

19  2007, released from parole.  Pursuant to 4A1.1(a), three

20  criminal history points are assessed.

21      November 7, 2005, charged with public intoxication, a

22  misdemeanor; Count 2, disorderly conduct, a misdemeanor,

23  Vanderburgh County, Indiana.  May 1, 2007, Counts 1 and 2,

24  received 30 days, suspended, fine and costs, to run concurrent

25  with Cause Number 0611-CM-8215.  Zero criminal history points

1    assessed.

2        In April of 2006, charged with reckless driving, a

3    misdemeanor.  May 1, 2007, 30 days, suspended, fine and costs.

4    Zero criminal history points assessed.

5        Criminal convictions result in a subtotal of 14 criminal

6    history points.  At the time the instant offense was committed,

7    the defendant was on parole for a sentence of dealing cocaine,

8    Vanderburgh County, Indiana, Cause Number 81CO1-202-FA-227

9    referred to in paragraph 75 of the presentence investigation

10   report.  Pursuant to 4A1.1(d), two points are added.

11       The instant offense was committed less than two years

12   following the defendant's release from custody for dealing

13   cocaine in Vanderburgh County in that conviction referred to in

14   paragraph 75.  Accordingly, pursuant to 4A1.1(e), one point is

15   added.  Total criminal history points, 17, placing him in a

16   category VI.

17       Pursuant to 4B1.1, a career offender's criminal history

18   category in every case shall be VI.

19       No other criminal conduct, no pending charges.

20       Other arrests over the years for possession of cocaine in

21   1996, possession of marijuana, resisting law enforcement,

22   possession of a stolen handgun, carrying a handgun without a

23   license within a thousand feet of a school dismissed in May of

24   '96; '98 domestic violence, battery, dismissed.  June of '98,

25   possession of marijuana, dismissed.  July of '98, resisting law

18

```
 1  enforcement, possession of marijuana, dismissed.  September of

 2  2001, carrying a handgun without a permit, possession of

 3  marijuana, dismissed.  December 3, 2001, dealing in cocaine,

 4  auto theft, dismissed.  December 29, 2001, trespass, possession

 5  of marijuana, dismissed.  November of '05, public intoxication,

 6  disorderly conduct, resisting law enforcement, dismissed.

 7  November 28 of 2005, visiting a common nuisance, dismissed.  In

 8  November of '06, driving while license suspended, dismissed.

 9     Background:  Personal history, born in January of 1977 in

10  Evansville, Indiana.  Defendant's parents were never married.

11  He's seen his father only three times and last saw him in 1994.

12  The defendant believes his father resides in Mississippi.  The

13  defendant's mother is a student, lives in Evansville.

14     The defendant has three half siblings, close to his

15  grandparents, as they helped to raise him, indicates that he

16  ran away from home at age 14, lived in random places due to

17  poverty level of family, a lack of food and clothes for

18  everyone.  Stated his childhood was not bad but could have been

19  better.  Informed he felt loved my his mother, whom he

20  described as his mentor and hero.

21     The defendant admitted he belonged to the Vice Lords gang

22  in Evansville from 1996 to 1998, further claims he's no longer

23  affiliated with that gang.

24     Physical condition:  He reports to the probation officer

25  that he was hospitalized at 23 due to a spinal code injury from
```

Judy Farris Mason, CSR

1   an automobile accident.  Defendant believes he's in fairly good

2   health, although he suffers from asthma and still experiences

3   some pain from the car accident.  He is not currently

4   experiencing any problems which require special medical

5   attention, and he's not under the care of a physician or taking

6   prescribed medication.

7       No history of mental health problems or treatment; however,

8   he reports that his mother made him attend counseling at

9   Mulberry Center age 14.  No further information regarding that

10  counseling was available.

11      Substance abuse history:  Defendant reports to the

12  probation officer he started drinking alcohol at age 17 and

13  drank until May of 2007, drank heavily daily.  First used

14  marijuana at age 17, continued up until a day or so before his

15  arrest, except for a while toward the end of 2006 and the

16  beginning of 2007.  He smoked one or two blunts a couple of

17  times a week.  The parole officer advised that the defendant

18  submitted three urine specimens that tested positive for

19  marijuana from 2006 to 2007.

20      The defendant confessed he believed he had a problem with

21  alcohol but did not state he had a problem with marijuana.  He

22  reported he attended treatment in Evansville at some point but

23  could not recall when or where.  He did not successfully

24  complete the program.  The defendant informed his grandfather

25  and cousin he had a problem with drinking alcohol, and several

1  uncles have had drug problems.   The defendant communicated his

2  mother and sisters state he is not the same person when he

3  drinks, quote.

4      Education:   He attended Reitz High School in Evansville.

5  He quit in the 11th grade.   He reports and records reflect he

6  obtained his GED on July 15, 1995.   He also was enrolled in

7  classes at the Indiana Business College in Evansville when he

8  was arrested.   Expresses a desire to pursue higher education.

9      Employment history:   Representative from QDC Packing stated

10  the defendant worked for the corporation on August 29, 2007,

11  and did not return due to his arrest on this charge.   Prior to

12  that, he worked at McDonald's in Newburgh for about

13  two-and-a-half months as a cook, discontinued that job because

14  of a lack of transportation.   He also worked other various jobs

15  and temporary agencies.   Also cut grass and did lawn work.

16  He's had periods of unemployment throughout his previous

17  supervision while on parole.

18      He reports no assets or liabilities.   He does have a bill

19  that's owed to Vectren Energy Company.   Does not have the

20  ability to pay a fine within the guideline range.

21      Sentencing options:   Term of imprisonment is up to 30

22  years.   Guideline range based upon a total offense level of 36,

23  criminal history category VI, the guideline range is 324 months

24  to 405 months.   However, the maximum statutory penalty is 360

25  months.   Therefore, the range becomes 324 to 360.

1      Supervised release:  Under the statute, at least six years;

2  under the guidelines, three to five.

3      Probation:  He is not eligible for probation.

4      Fines:  Under the statute, maximum is $2 million; special

5  assessment of $100 is mandatory.  Under the guidelines, the

6  fine range is 20,000 to $2 million.  Restitution is not an

7  issue.

8      Probation officer has not identified any information

9  warranting a departure from the guidelines.

10      No objections from the government, no objections from

11  defense counsel.

12      All right.  Those are the findings of the Court based upon

13  the information contained in the presentence investigation

14  report, Mr. Perry, regarding the history of the charges, the

15  facts of your involvement in this particular conspiracy as laid

16  out by the probation officer based upon the information from

17  the government and also the information and evidence adduced at

18  trial, the advisory guideline applications as recommended by

19  the probation officer, your criminal history, and your personal

20  background.

21      At this point in the proceedings, Mr. Perry, do you have

22  any questions or comments regarding anything?

23              (Defendant and counsel conferring)

24          THE DEFENDANT:  No.

25          THE COURT:  All right.  At this stage of the

```
 1   proceedings, then, Mr. Perry, you have an opportunity and a

 2   right to present any evidence, testimony you wish regarding the

 3   issue of the appropriate sentence.  Also, you have a right and

 4   opportunity to make any comment or have your attorney speak on

 5   your behalf regarding the issue of the appropriate sentence and

 6   any mitigation.  And, of course, the government has that same

 7   right and opportunity.

 8        Do you understand this?

 9             THE DEFENDANT:  Yes.

10             THE COURT:  All right.  Mr. Tullis, evidence,

11   testimony, comment?

12             MR. TULLIS:  We don't have any testimony we're going

13   to be presenting.  I do have some argument --

14             THE COURT:  All right.

15             MR. TULLIS:  -- if I could be heard, Your Honor.

16             THE COURT:  You may.

17             MR. TULLIS:  Thank you.

18        Judge, Mr. Perry was specifically found guilty of a

19   conspiracy involving less than five grams of cocaine base,

20   acquitted of the gun charge.  Under that sentence that's

21   applicable under the statute, 26 U.S. Code 841, the sentencing

22   range is zero to 30 years.  We believe that a sentence is more

23   appropriate in the lines of perhaps a --

24                       (Squealing noise)

25             MR. BLACKINGTON:  If Mr. Tullis could stop, please.  I
```

```
1    can't hear.

2            COURTROOM DEPUTY DANA SHULER:  I turned it off.

3            THE COURT:  Okay.

4            MR. TULLIS:  The most appropriate sentence would be

5    one, probably, towards the lower end of that zero-to-30-year

6    range and with some halfway-house involvement.  You will recall

7    that there were some -- during the trial there were pretty,

8    I'll term it rugged testimony that came out with respect to

9    suspicions that an individual at a tow truck company had made

10   off with some drugs, and Mr. Perry was not even involved in

11   that.  And the jury found that -- if we assume for the sake of

12   argument that Mr. Perry had involvement, and the jury found

13   that he had some involvement, it's at a very low level.  It

14   involves five grams, less than five grams of cocaine base.

15       He does have a significant record.  However, Mr. Perry, I

16   think, basically had, what we can glean from the evidence, is

17   gone about trying to right himself, trying to right the ship;

18   unfortunately, was probably caught up in this early on and had

19   not been able to extricate himself due to the passage of time

20   such to amount to essentially a renunciation of any sort of the

21   conspiracy.

22       I realize the guidelines are what they are.  There is no

23   doubt or no argument that can be made, at least with a straight

24   face, by me or Mr. Perry that he is not considered a career

25   offender, category VI.  And if we take away the career
```

```
 1  offender, he certainly meets the category VI independently of
 2  that by all the criminal history points.  But at the time of
 3  his arrest, I think what is salient here is that he was
 4  enrolled in business college; he was working; he was attempting
 5  to right the ship and to move on.
 6      I think that the business that Mr. Perry knew of the other
 7  part of the conspiracy, I don't think there's any evidence of
 8  that.  When we hear about all of the things that go on out on
 9  164 and David Neighbors running through the cornfield, some
10  people, I think, during the trial found rather humorous, no
11  doubt, no question, no testimony anywhere that Trevor Perry did
12  not know that, was not involved with that, had nothing to do
13  with that, was not out driving trying to pick up Mr. Neighbors.
14  So I think his involvement, we concede that for the sake of
15  argument was on a very small level, and that's what the jury
16  believed.
17      Now, Mr. Blackington raised the case U.S. versus Aristeed
18  Cannon, Seventh Circuit case, 539 F.3d 601.  This was a
19  situation where the Court, over a jury verdict, found that the
20  defendant had possessed -- conspiracy with intent to possess
21  54 grams of crack, as opposed to the less than 50 that the jury
22  had imposed by way of sentencing or by way of trial brief.  In
23  that case we have -- the Court had some latitude there because
24  there was some questions about the weight of the drugs.  In
25  that case the Illinois State Police had one weight, and the
```

local police department in Illinois there had a different

weight; their weight was lower.  The judge took the state

police's weight because he found that those scales, drug scales

were calibrated, and there was some evidence and testimony and

so forth, so he deviated, and he went from -- above 50 grams,

which kicked in on Mr. Cannon's case the ten-year minimum.  So

there was a basis to deviate, I believe, based upon -- without

running afoul of Apprendi because they didn't go over the

statutory maximum.  But there is not in this case because there

is simply no evidence that Mr. Perry was involved in anything

other than the jury believed a very, very minor role, and they

sat and heard this case for, I believe, eight or nine days, and

we've had no new evidence adduced since the trial or at this

hearing.  I don't think we're going to hear any new evidence

that Mr. Perry had any further involvement.

    We are moving the Court, Your Honor, to place Mr. Perry

into a halfway house, the least-restrictive custody environment

that is possible, to allow him to go back to doing what he was

doing at the time he was arrested, some sort of gainful

employment and some sort of educational background so that he

can right the ship and hopefully go on and become a productive

citizen.

    Thank you.

            THE DEFENDANT:  Mr. Tullis, can I speak?

            THE COURT:  Yes.  Mr. Perry, you certainly have a

1   right to speak.

2          THE DEFENDANT:  I want to let you know why I'm still

3   maintaining my innocence, because throughout me being

4   incarcerated this whole time and then proceeding to trial,

5   there was nothing produced to prove, for one, an arrest warrant

6   that still has never been brought in the first place why I was

7   incarcerated or why the FBI agents were at my house in the

8   first place to search my crib and bringing me in, charging me

9   with a shotgun and a scale, which the shotgun I was acquitted

10  of, but there was no evidence produce a probable cause, for

11  one, to have me indicted or arrested.

12      Then on top of that, when the officers gave statements or

13  testimony in our trial as far as Officer Simpson and DEA Agent

14  Freyberger, they testified that they didn't hear my voice or

15  didn't recognize my voice until interviewing me at the day of

16  my arrest and court proceedings.  Well, they went to the grand

17  jury three weeks prior to this and told the grand jury that

18  they knew that's who I was before they indicted me, which still

19  I can't remember actually what the case law actually was, but

20  suspicion of electronic surveillance still isn't enough,

21  especially when they couldn't prove, one, that was me on the

22  phone; two, that I even owned a phone; three, that I had any

23  contact with Mr. Neighbors, period, and to even verify that

24  they never could prove any of this, I lived on the same block

25  where all this was supposed to have been taking place at, and

```
 1   my house was never brought up one time in this whole incident.
 2   Mr. Simmons' case was right across the street from my house.  I
 3   never had any dealings with him.  My family which is indicted,
 4   Mr. Neighbors and the rest of my family from Mr. Kirk to
 5   Mr. Horne, lived houses down the same block.  My address was
 6   never once mentioned in here.  Plus due to that, my name was
 7   never in any paperwork.  In the trial I never had the testimony
 8   from a, I guess, confidential informant, federal officer.
 9   There was no crack at my house, cocaine base, no powder, no
10   marijuana, only a legal scale that I don't even know if it
11   worked because, I mean, when they got it, I'm pretty sure it
12   could have been anybody's scale because when they took me out
13   of my house, I was not there when they searched my house.
14       My point is, all this took place, and I had to go to trial
15   and still have to maintain my innocence when there was no
16   evidence produced, period, to even have me incarcerated.  I
17   mean, it's really belittling to have to continue to be who I am
18   as a person in Evansville, anyways, as hectic as it is, but to
19   then be thrown in a federal case with no actual evidence to
20   even have ties besides with family, and then I'm -- actually an
21   officer made -- a statement made by Officer Tony Johnson in one
22   in the grand jury minutes that they actually target -- the task
23   force, the DEA task force tied together actually targets
24   individuals with felony backgrounds just to send them federally
25   just to give them more severe time.
```

1        Now, here it is I'm struggling trying to pay my bills, stay

2   out of jail, stay out of incarceration and other things, and

3   then here it is, I'm slammed in a bunch of chaos when nobody

4   can even tell me why they even indicted me in the first place.

5   There isn't a shred of evidence that says I should have been

6   indicted in the first place.

7        On top of that, I haven't even been -- I was unlawfully

8   incarcerated.  There was no arrest warrant when I first got

9   detained.  There was no arrest warrant when they came to my

10  house.  There was no search warrant when they came to my house.

11  There was no arrest warrant when I got downtown.

12       Now, when I got here, 30 days prior to my trial date, the

13  government reindicts me and then slaps me with another arrest

14  warrant.  Well, that's like putting deodorant over sweat; it's

15  still going to stink.  So regardless of the fact that he showed

16  an arrest warrant after I've been incarcerated for 11 months, I

17  still have been illegally detained.

18       So me personally, I don't believe that I should deserve to

19  be sent back to prison when, true enough, the jury did find me

20  guilty, but the system just -- I don't know how I got slipped

21  through the crack and happened to be that one.  I'm not going

22  to cry about it; I'm just going to do whatever it is that you

23  hand down, regardless, whatever the sentence is, but I just

24  feel like that I didn't maintain my innocence just to be

25  maintaining my innocence.

1            And I just wanted the record to be reflected that the

2     reason why I never said anything, I've spoken up before, but I

3     was so harshly criticized in the past that it's kind of, like I

4     said, belittling to keep sitting back and having to keep taking

5     all this.  You know what I mean?  So my point is, I don't

6     believe that I should be sent to prison.  Maybe the Court

7     doesn't find that I should be, as my attorney advised on my

8     presentence investigation read for time served, but at least,

9     as he said, I should be able to go back to working and be able

10    to be in school like I was trying to further myself in the

11    first place.  And that's why I've been maintaining my

12    innocence.

13            THE COURT:  Thank you, Mr. Perry.

14        Mr. Blackington, on behalf of the government.

15            MR. BLACKINGTON:  I think I've set forth the

16    parameters of the sentencing options that the Court has in the

17    memorandum.  By the jury's verdict, there's, of course, a

18    minimum sentence of zero, a maximum sentence of 360.  And as

19    the Cannon case identified, the Court has the discretion to --

20    well, the Court has an obligation, not just the discretion, the

21    obligation to look at the evidence at this point, and if it

22    finds by a preponderance of the evidence that the presentence

23    report is right and that Mr. Perry was involved with the

24    distribution of more than 50 grams of crack, the sentence is a

25    mandatory 30 years.  That's what Cannon says as far as the

1  interplay between Apprendi and the mandatory minimum, so the

2  Court first needs to weigh the evidence, determine if he's

3  responsible for 50 grams or more of crack.

4      If the Court finds by a preponderance, not beyond a

5  reasonable doubt as the jury was tasked with, but by a

6  preponderance that it's over 50 grams, the sentence has to be

7  30 years.  And I think the evidence of the wiretap supports

8  that, that he, in fact, distributed that by himself.

9      If the Court doesn't make that finding, then we're at the

10 point where he's a career offender.  The guideline range -- or

11 the statutory range is zero to 30, and the guidelines are then

12 262 to 327.  And I think the guidelines are appropriate in this

13 case.  I mean, the defendant has a prior drug record.  He has a

14 record of crimes of violence.  His criminal record runs from

15 1994 through the date of his arrest when he was, I believe, on

16 probation -- or he was on parole in the dealing-cocaine charge,

17 so this guy has basically been under supervision since 1994,

18 either jail, probation, or parole, and it hasn't gotten through

19 to him that it's time to get his act together.

20     Now, the thing that I'd suggest is going on here, the

21 tattoos on the defendant speak for themselves and tell you what

22 this case is about.  It's about the all-mighty dollar, get rich

23 or die trying.  That's what this case is about.  This guy

24 wasn't a crack addict who was out there peddling crack to

25 satisfy his addiction.  The record shows he's a small-time

1  marijuana user.  But this crack -- this guy wasn't someone with

2  a $300-a-day crack addiction who was out there peddling drugs

3  to support his addiction.  He was getting rich or die trying.

4  What's what this case is about.

5      He's got a record of violence.  There's absolutely nothing

6  that justifies a departure from the guidelines in the event the

7  Court doesn't find him accountable for more than 50 grams of

8  crack.  So we would ask the Court to sentence him to 360

9  months, as we have.

10     And I'd ask you specifically, with all respect to

11 Mr. Tullis, his argument was that you should send him back, let

12 him go to a halfway house, released to do what he was doing at

13 the time of his arrest.  What was he doing at the time of his

14 arrest?  The wiretap tells us.  He was selling crack, and

15 that's not what we want.  And his record has shown that

16 probation, parole, and jail, small amounts of jail and then

17 release can't stop him from committing crimes, crimes of

18 violence or drug dealing.

19     So we believe that that sentence of 360 months is

20 appropriate.  If the Court does not give him that sentence, we

21 believe that the guideline range for a career offender is

22 appropriate.

23     Thank you.

24          THE COURT:  Thank you, Mr. Blackington.

25          THE DEFENDANT:  May I say something again?

1          THE COURT:  Sure.

2          THE DEFENDANT:  For one, I have never really had a

3    charge with violence ever.  For two, the PSI, like I told my

4    lawyer -- I even wrote the PSI lady and had my mother call.

5    The PSI is incorrect because they're charging me with the same

6    amount that they gave a young man life with yesterday,

7    3,000-plus grams of crack cocaine, plus I was not found guilty

8    of powder cocaine.  So for my PSI to read 3,000-plus grams of

9    crack cocaine and powder, that's definitely wrong.

10      Then on top of that, I'm being -- like I said, I'm being

11   charged with the head conspirator on my case, and there's

12   people in my case that went to trial at the same time I did who

13   have a less finding of a crack base level than I do.  So

14   somewhere between this courtroom's court minutes and the PSI,

15   somebody is lying.

16          THE COURT:  Mr. Blackington.

17          MR. BLACKINGTON:  Judge, just last time -- the Seventh

18   Circuit's found dealing, possessing of sawed-off shotguns to be

19   a crime of violence, and I don't know of any construction that

20   can be given --

21          THE DEFENDANT:  I was 17.

22          MR. BLACKINGTON:  -- to the crime of battery that it's

23   not a crime of violence.  That's what battery is.

24      So that's all I have to say on that point.

25      I'd just ask the Court, as well, to incorporate the

1   findings of the jury and the post -- in the sentencing phase of

2   the trial and also to find beyond a reasonable doubt that he's

3   committed prior drug felonies.

4           MR. TULLIS:  Judge, I would point out -- I don't know

5   what battery Mr. Blackington is speaking of.  Item 86 of his

6   criminal history, domestic violence, battery, that was

7   dismissed.

8           MR. BLACKINGTON:  Paragraph 69.

9           MR. TULLIS:  Okay.  The domestic violence matter was

10  dismissed.

11          MR. BLACKINGTON:  Paragraph 69 shows that he got a

12  year in Indiana Department of Correction for battery.

13          MR. TULLIS:  We don't have the benefit of what facts

14  were behind that charge, as we do the other charges.  We don't

15  have a factual background.

16          THE COURT:  Let me take a brief recess here.

17  Mr. DeCarli, can I talk to you just for a minute?

18              (Recess taken from 9:10 a.m. to 9:16 a.m.)

19          THE COURT:  All right.  We're back on the record.

20      The Court has consulted with the advisory guidelines and

21  has indicated its findings based upon the information contained

22  in the presentence investigation report, now turns to 3553 of

23  Title 18, factors to be considered in imposing a sentence.  The

24  Court shall impose a sentence sufficient but not greater than

25  necessary to comply with the purposes set forth.

34

1     Mr. Tullis, would you and your client please take the

2   lectern.

3          MR. BLACKINGTON:  Your Honor, I just had a question.

4   Did the Court -- the Court -- I didn't take notes.  What did

5   the Court determine the guidelines and so forth to be?

6          THE COURT:  Well, I went through it the first time.

7   It was --

8          MR. BLACKINGTON:  Did you follow the presentence

9   investigation report?

10          THE COURT:  Followed the presentence report at that

11   point, but the key finding is I agree with the presentence

12   investigation report that he is, indeed, a career offender.

13          MR. BLACKINGTON:  Okay.

14          THE COURT:  The factors to be considered in imposing a

15   sentence:

16     The nature and circumstances of the offense:  This was a

17   substantial conspiracy involving the distribution of powder and

18   crack cocaine in southwestern Indiana.  The defendant was found

19   guilty of participating in that conspiracy.  The jury found the

20   defendant was guilty of conspiracy to distribute less than five

21   grams of cocaine base and then found him not guilty on the

22   firearms charged.

23     The defendant was involved in the conspiracy with defendant

24   David Neighbors.  As I indicated earlier, the evidence

25   presented by the government was strong in terms of the guilt of

1   the participants in the conspiracy, and the Court believed the

2   evidence was strong in support of the conviction of Mr. Perry

3   as a participant in that conspiracy.

4        The telephone calls, the identification of Mr. Perry's

5   voice, which is distinctive in this Court's opinion, was strong

6   and reliable as far as the Court was concerned.  The Court has

7   no question that the evidence supported the jury's belief that

8   it was, indeed, Mr. Perry talking to Mr. Neighbors on the

9   wiretap conversations.

10       History and characteristics of the defendant:  The

11  defendant is no stranger to the criminal justice system.  He's

12  deemed to be under the guidelines, advisory guidelines, a

13  career offender.  He maintains his innocence in his matter,

14  which certainly is his right to do.  However, that flies in the

15  face of strong evidence to the contrary.

16       The need for the sentence imposed to reflect the

17  seriousness of the offense, promote respect for the law, and

18  provide just punishment for the offense:  The Court believes

19  that a sentence in the guideline range would, indeed, satisfy

20  those criteria.

21       Afford adequate deterrence to criminal conduct:  Hopefully,

22  the folks who are contemplating similar criminal conduct, once

23  they are aware of the serious penalties that are imposed for

24  individuals who are career offenders or who are involved in

25  conspiracies to distribute cocaine and crack cocaine, hopefully

36

1   they would think again about becoming involved in that type of

2   drug trafficking.

3        Protect the public from further crimes of the defendant:

4   The guidelines range would certainly satisfy that criteria.

5        Provide the defendant with needed educational, vocational

6   training, medical care or other correctional treatment in the

7   most effective manner:  The defendant indicates that he wishes

8   to continue his studies.  He was in business classes prior to

9   his arrest.  He appears to the Court to be a very intelligent

10  young man.  If he had spent time with classes and other

11  productive avenues using his intelligence other than becoming

12  involved in criminal activity, he may not have found himself in

13  this serious situation he finds himself today.  The Court

14  believes the defendant does have the intelligence to become a

15  productive member of society and hopefully will take advantage

16  of educational, vocational programs while he's at the Bureau of

17  Prisons.

18       And the need to avoid unwarranted sentence disparities

19  among defendants with similar records who have been found

20  guilty of similar conduct:  This Court has had many individuals

21  come into court for sentencing who have similar records who are

22  career offenders who have been involved in cocaine

23  conspiracies, and the sentence imposed in almost all instances

24  has been the guideline sentence for a career offender.

25       So the Court now has consulted with the advisory guidelines

1    and has consulted and considered the factors outlined in 3553,

2    now is ready to impose judgment and sentence.

3        Do you know of any legal reason, Mr. Tullis, why the Court

4    cannot impose judgment and sentence at this time?

5            MR. TULLIS:  No, Your Honor.

6            THE COURT:  Mr. Blackington?

7            MR. BLACKINGTON:  No, Your Honor.

8            THE COURT:  All right.  The Court now imposes judgment

9    of sentence on Count 1, conspiracy to distribute less than five

10   grams of cocaine base, a violation of 21 U.S. Code, Section

11   841(a)(1), 846, and 851(a)(1), and the Court specifically

12   adopts and incorporates into the record the proceedings and

13   findings of the jury regarding the 851 information as to

14   defendant's prior drug felony conviction.

15       The Court in the advisory guideline initially indicated, as

16   the probation officer did, that the equivalency was generating

17   an offense level of 36.  The Court is mindful of the jury's

18   verdict here and respects the jury's verdict and will sentence

19   according to the jury's verdict, the conspiracy to distribute

20   less than five grams of cocaine base.  The Chapter 4

21   enhancements, however, I do find that the defendant is a career

22   offender, and that generates, of course, a level of 34, which

23   the Court will find is the appropriate level in this case,

24   criminal history category VI, 262 to 327 months.

25       The Court further finds for the justification of the

sentence -- and the sentence will be at the high end of the
guideline range -- the defendant has been involved in criminal
activity for most of his adult life.  He has been given
opportunities to become a productive member of society.  He has
not taken advantage of those opportunities with continuing to
be involved in criminal activity, arrested and convicted.  A
criminal career offender is by definition an individual who
consistently comes into courtrooms and has not been able to
conform his conduct to lawful means, and the Court sees no
reason to believe that Mr. Perry is going to change his ways in
any fashion, so a significant sentence is justified here to
protect the public from further criminal activity of the
defendant.

     Pursuant to the Sentencing Reform Act of 1984, it's the
judgment of the Court the defendant, Trevor Perry, is hereby
committed to the custody of the Bureau of Prisons to be
imprisoned for a term of 327 months.  The sentence is to
promote respect for the law, provide adequate deterrence to
criminal conduct, and protect the public from further crimes of
the defendant.

     There will be no fine.  The defendant shall forfeit
unspecified property derived from any proceeds the defendant
obtained directly or indirectly as a result of the offense of
which he's convicted and all property used or intended to be
used in any manner to facilitate the commission of the offense

1   for which he is convicted.

2       Upon release from imprisonment, the defendant shall be

3   placed on supervised release for a term of six years.  Within

4   72 hours of release from the custody of the Bureau of Prisons,

5   the defendant shall report in person to the probation office in

6   the district to which he is released.  While on supervised

7   release, the defendant shall not commit another federal, state,

8   or local crime, shall not possess a firearm, ammunition,

9   destructive device, or any dangerous weapon, shall cooperate

10  with the collection of a DNA sample and shall refrain from any

11  unlawful use of a controlled substance and shall submit to one

12  drug test within 15 days of placement on supervised release and

13  two periodic tests thereafter as directed by the probation

14  officer.

15      Further, the defendant shall comply with the standard

16  conditions adopted by the Judicial Conference of the United

17  States, as well as the following additional conditions:  The

18  defendant shall provide the probation officer access to any

19  requested financial information.  The defendant shall not incur

20  new credit charges or open additional lines of credit without

21  the approval of the probation officer.  The defendant shall

22  participate in a substance abuse treatment program which may

23  include no more than eight drug tests per month and shall pay a

24  portion of the fees.  The defendant shall submit to a search,

25  with the assistance of other law enforcement, as necessary, of

1   his person, vehicle, office, business, residence, and property,

2   including computer systems and peripheral devices.  The

3   defendant shall submit to the seizure of contraband found.  The

4   defendant shall warn other occupants the premises may be

5   subject to searches.  The defendant shall not be a member of

6   any gang or associate with individuals who are members.

7        The defendant shall pay the United States a special

8   assessment of $100.  It's a mandatory special assessment,

9   payment due immediately, made directly to the Clerk, United

10  States District Court.

11       That is your sentence, Mr. Perry.  It is not the statutory

12  maximum, but it is, indeed, a significant sentence, and that,

13  of course, is due to your prior criminal history getting you

14  into this situation where the sentence involves the

15  determination that you are a career criminal.

16       You're entitled to an appeal of the conviction and

17  sentence.  Do you understand this?

18            THE DEFENDANT:  Well.

19            THE COURT:  Okay.  If you wish to appeal, you must

20  file a notice of appeal with the clerk of the court within ten

21  days of entry of judgment in the matter.  Do you understand

22  this procedure?

23            THE DEFENDANT:  Yes, I do.

24            THE COURT:  All right.  Mr. Tullis, the Court

25  instructs you if Mr. Perry wishes to appeal, you file a notice

1   of appeal with the clerk of the court within the appropriate

2   and required timeline.

3          MR. TULLIS:  Your Honor, I will.  I'd also move the

4   Court to recommend to the Bureau of Prisons a place of

5   incarceration that is as close to Evansville, Indiana, as

6   possible so Mr. Perry can visit with his family and for

7   referral of Mr. Perry to the 500-hour drug program.

8          THE COURT:  The Court recommends the Bureau of Prisons

9   evaluate Mr. Perry for participation in the 500-hour drug and

10  substance abuse treatment program.  The Court also recommends

11  the Bureau of Prisons house Mr. Perry in a Bureau of Prisons

12  facility close to his place of residence in Indiana.  That's a

13  recommendation we make to the Bureau, Mr. Perry.  The Bureau

14  feels, as well as the Court, that visitation is important with

15  family, and we try to make that as easy as possible.  However,

16  sometimes the Bureau cannot follow our recommendations due to

17  space limitations or security level requirements.

18     And the other cause is being dismissed, Mr. Blackington; is

19  that right?

20         MR. BLACKINGTON:  Yeah, I filed a motion a couple days

21  ago.

22         THE COURT:  All right.  Anything further today,

23  Mr. Tullis?

24         MR. TULLIS:  I have nothing further, Your Honor.

25         THE COURT:  Mr. Perry, any questions about anything?

 1            THE DEFENDANT:  Yeah.  I don't see how you could come

 2    out here and actually act like you were going to impose

 3    anything that was anywhere fair or sympathetic for me in behalf

 4    of my sentencing, so I don't understand if that it was me or

 5    was it you; did we both miss the trial?  I mean, did we see not

 6    the same evidence?  Because I understand, based on the

 7    evidence, there was no evidence, so how is it based on the

 8    evidence I was sentenced to 25-plus years?

 9            THE COURT:  You were sentenced based upon the

10    conviction.

11            THE DEFENDANT:  Of what?

12            THE COURT:  That the jury returned.

13            THE DEFENDANT:  At a base level of 22, you pushed me

14    into Category VI, maxxed me out at 17 points plus 34.

15            THE COURT:  I've already justified my sentence,

16    Mr. Perry.

17            THE DEFENDANT:  You asked me did I have the floor to

18    ask a question.

19            THE COURT:  You are a career offender.

20            THE DEFENDANT:  So I'm asking my question.  I need an

21    explanation.  That really isn't justified because you at the

22    same time insulted my intelligence to say that I wasn't

23    intelligent enough to be aware of the situation that you just

24    put me in.

25            THE COURT:  Well, I'm not going to argue with you

1   here, but your prior conduct over the last years --

2          THE DEFENDANT:  That's cool.  I mean, it just shows

3   the most vindictive and racial suggested information you can

4   do.

5          THE COURT:  Good luck to you, Mr. Perry.

6          THE DEFENDANT:  Yeah, good luck to you, too, and

7   seasons greetings, too.

8                  (Court adjourned at 9:31 a.m.)

9                  CERTIFICATE OF REPORTER

10

11      I, Judy Farris Mason, Official Reporter for the United
    States District Court, Southern District of Indiana, 318
12  Federal Building, Evansville, Indiana 47708, hereby certify
    that the foregoing transcript constitutes a true, full, and
13  correct transcript of my shorthand notes taken of the
    proceedings hereinbefore entitled and reduced to typewriting by
14  computer to the best of my ability.

15

16  s/Judy Farris Mason_____   January 28, 2010
       Judy Farris Mason, CSR
17

18

19

20

21

22

23

24

25